885 So.2d 111 (2003)
Ernest MIDDLETON, as administrator of the estate of Lula Mae McDougle, deceased
v.
Robert LIGHTFOOT, M.D., and Lightfoot and Lightfoot Surgery, P.C.
1020666.
Supreme Court of Alabama.
October 24, 2003.
Rehearing Denied January 30, 2004.
*112 Stephen D. Heninger of Heninger, Burge, Vargo & Davis, LLP, Birmingham, for appellant.
Norman E. Waldrop, Jr., and A. Edwin Stuardi of Armbrecht Jackson, LLP, Mobile, for appellees.
WOODALL, Justice.
Ernest Middleton, as administrator of the estate of Lula Mae McDougle, deceased, appeals from a judgment entered on a jury verdict in favor of Robert Lightfoot, M.D., and Lightfoot and Lightfoot Surgery, P.C. (hereinafter referred to collectively as "Lightfoot"), in Middleton's medical-malpractice action based on the alleged wrongful death of McDougle. We reverse and remand.

I. Facts and Background
On April 24, 2000, McDougle was admitted to the University of South Alabama Knollwood Park Hospital for surgery to relieve a condition diagnosed by Dr. Lightfoot as "cholelithiasis" (gallstones). Dr. Lightfoot performed a "cholecystectomy," that is, surgical removal of the gallbladder. He first attempted to remove the gallbladder "laparoscopically," that is, by inserting a series of "ports," or "trocars," into the abdominal wall, through which the gallbladder could be removed. He inserted an "umbilical trocar," which was approximately 11 millimeters in diameter, through the lower abdomen; however, he abandoned the laparoscopic procedure because his vision of and access to the gallbladder were obscured by "adhesions," that is, scar tissue or "extra-fibrous tissue." He then removed the trocars and made a larger incision in the lower abdomen, through which he extracted the gallbladder. McDougle was released from the hospital at approximately 9:15 a.m. the following morning, April 25. By 6:30 a.m. on April 26, McDougle was dead. An autopsy revealed an 11-millimeter perforation of the "jejunum," that is, the "small bowel," near the incision into which Dr. Lightfoot had inserted the "umbilical trocar" during the abortive laparoscopic cholecystectomy.
On August 25, 2000, Katherine Middleton, as administratrix and personal representative of McDougle's estate, sued Lightfoot. The complaint alleged, among other things, that Lightfoot "caused or negligently allowed the [gallbladder surgery] to be performed in such a manner that [McDougle] suffered a perforated [bowel], which led to acute peritonitis and infection that caused [her death]." (Emphasis *113 added.) It also alleged that Lightfoot allowed McDougle "to go without proper and necessary evaluation, work-up, diagnosis and treatment of her perforation and resulting peritonitis and prematurely and improperly discharged [her] in spite of signs and symptoms of her problems." Finally, the complaint averred that Lightfoot "negligently caused or allowed the perforation and resulting peritonitis to occur without proper and timely evaluation of the patient in spite of conditions which should have caused further concern and evaluation of potential complications." Subsequently, Ernest Middleton was substituted for Katherine Middleton as the administrator of McDougle's estate and thus the plaintiff.
The jury trial of the case focused primarily on two issues: (1) the cause of death, and (2) the standard of care. As for the cause of death, the autopsy report failed to attribute death to a specific cause. Middleton's theory of the case was that Dr. Lightfoot inadvertently punctured the bowel with the umbilical trocar during the laparoscopic procedure and failed to discover and treat the injury. According to this theory, the contents of the bowel escaped through the puncture, resulting in "acute peritonitis," infection, and ultimately McDougle's death. Middleton presented expert testimony indicating that Dr. Lightfoot had breached the standard of care in failing to discover and repair the perforation.
Lightfoot did not challenge the autopsy finding that McDougle's bowel was perforated at the time of her death, but challenged the theory that the perforation occurred during the surgical procedure, as well as Middleton's theory as to the cause of McDougle's death. According to Lightfoot, the perforation resulted, not from the insertion of the trocar, but from a bowel "impaction." According to that theory, death resulted, not from peritonitis or infection, but from a "pulmonary embolus," having no connection with the perforated bowel. The jury returned a verdict in favor of Lightfoot.
Middleton moved for a new trial, on the ground, among others, that the trial court erred in allowing Lightfoot to cross-examine Middleton's expert witness regarding medical-malpractice actions that have been brought against the witness. The trial court did not rule on the new-trial motion, and it was denied by operation of law. Ala. R. Civ. P. 59.1. Middleton appealed, reasserting his challenge to the evidence elicited on cross-examination of his expert witness.

II. Standard of Review
"`The standard applicable to a review of a trial court's rulings on the admission of evidence is determined by two fundamental principles. The first grants trial judges wide discretion to exclude or to admit evidence.'" Mock v. Allen, 783 So.2d 828, 835 (Ala.2000) (quoting Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala.1998)). Despite the latitude afforded the trial court in its evidentiary rulings, a trial court exceeds its discretion where it admits prejudicial evidence that has no probative value. See Powell v. State, 796 So.2d 404, 419 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001).
"`The second principle "is that a judgment cannot be reversed on appeal for an error [in the improper admission of evidence] unless ... it should appear that the error complained of has probably injuriously affected substantial rights of the parties."'" Mock, 783 So.2d at 835 (quoting Wal-Mart Stores, 726 So.2d at 655, quoting in turn Atkins v. Lee, 603 So.2d 937, 941 (Ala.1992)). See also Ala. R.App. P. 45. "The burden of establishing that an erroneous ruling was prejudicial is on the *114 appellant." Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991).

III. Analysis
Before trial, Middleton filed a motion in limine, seeking to exclude evidence of medical-malpractice actions in which Dr. Mark Gordon, his expert witness, had been a defendant. The motion specifically sought to exclude any reference to one such case that "involved the cutting of a [bile] duct during gallbladder surgery," on the grounds that testimony as to that case would be irrelevant and prejudicial. The trial court denied the motion and the case proceeded to trial.
In order to establish that Dr. Lightfoot had breached the standard of care in treating McDougle, Middleton read into evidence at trial deposition testimony of Dr. Gordon. Dr. Gordon expressed the following opinions, among others: (1) that the perforation was caused by Dr. Lightfoot's insertion of the trocar, (2) that Dr. Lightfoot breached the standard of care in failing to discover and repair the perforation, and (3) that McDougle died "by sepsis from acute peritonitis" resulting from the perforation.
During the trial, Lightfoot's counsel prepared to read into evidence portions of Dr. Gordon's deposition involving malpractice actions in which Dr. Gordon had been a defendant. At that time, Middleton's counsel renewed their objections to the evidence on the grounds stated in the motion in limine. The trial court overruled the objection, and the testimony was read into evidence.
The testimony included specific references to three medical-malpractice actions that had been brought against Dr. Gordon, with particular emphasis on a case involving a laparoscopic cholecystectomy, in which Dr. Gordon mistook a small bile duct for a vein and deliberately clipped the duct. In that connection, Lightfoot was allowed to show that the patient not only sued Dr. Gordon, but also sent him threatening correspondence.
Middleton argues that "[p]rior suits against [an expert] witness have no probative value and simply demonstrate an attempt to prejudice the jury regarding the witness." Middleton's brief, at 26. He contends that such testimony has "nothing to do with anything except to prejudice the jury into thinking [the] witness must be a bad doctor because he has been sued himself." Id. at 31.
Lightfoot contends that the testimony elicited from Dr. Gordon was relevant to show "bias and lack of credibility." More specifically, Lightfoot insists:
"Dr. Gordon allegedly performed an inspection of the operative area [in the laparoscopic-cholecystectomy malpractice action against him] and did not recognize the injury prior to the procedure being completed. The patient was sent home the same day of the procedure. Two days later the patient was admitted to the hospital to repair the injured common bile duct. Even though Dr. Gordon failed to identify the injury after inspecting the operative area and before closure, Dr. Gordon testified in his case, that he complied with the standard of care.
"Dr. Gordon's [laparoscopic-cholecystectomy] case involves the same standard of care issues addressed in the present case, specifically, inspecting the operative area in abdominal surgery and attempting to identify any injury prior to closure. Dr. Gordon, however, has created two unique standards of care; one that applies to himself as a surgeon and one that applies to his role as a professional witness. The inconsistent nature of these standards of care shows *115 Dr. Gordon's bias [in favor of Middleton] and lack of credibility."
Lightfoot's brief, at 36 (emphasis in original) (citations to the record omitted). In support of that proposition, Lightfoot cites Clements v. Dr. John Alvan Stewart, P.C., 595 So.2d 858 (Ala.1992). Clements, however, is inapposite.
Clements was a medical-malpractice action brought by William Clements against Dr. John Alvan Stewart, P.C., and Dermatology Clinic (collectively referred to as "Dr. Stewart"). 595 So.2d at 859. "Before [Dr. Stewart's] medical expert witness testified, [Dr. Stewart] moved in limine to preclude [Clements] from cross-examining [the expert] witness `regarding the fact that he had been a defendant in a [medical negligence] lawsuit.'" 595 So.2d at 862-63. The trial court granted the motion, and Clements made that denial the basis for a motion for a new trial, after the jury returned a verdict in favor of Dr. Stewart. 595 So.2d at 863. The issue presented on appeal was "[w]hether [Clements] was unfairly prejudiced by not being permitted to question [Dr. Stewart's] medical expert witness about that witness's `recent involvement as a defendant in a medical negligence action.'" 595 So.2d at 862 (emphasis omitted).
This Court answered that question in the affirmative. In doing so, it said:
"In the present case, the testimony of the defendant's medical expert was critical to the defendant's case, in that it was contrary to the opinion that had been expressed by the plaintiff's expert witness, which was to the effect that the defendant had deviated from the appropriate standard of care. The plaintiff made an offer of proof outside the presence of the jury that showed that the defendant's medical expert had been a defendant in a medical malpractice action; that the witness had been represented in that action by the same law firm that now represents the defendant; and that that action had been settled. Although we are mindful of the trial court's considerable discretion in ruling on evidentiary matters of this kind, we believe that the trial court unduly and unnecessarily restricted the plaintiff's cross-examination of this witness with respect to any bias that he may have had against plaintiffs in medical malpractice actions and that, as a result, the plaintiff's case was substantially prejudiced."
595 So.2d at 864 (emphasis added).
Obviously, Clements presented elements of potential bias not presented in this case. In particular, unlike Dr. Gordon, Dr. Stewart's expert witness had been represented by the same law firm that was defending Dr. Stewart. Moreover, the posture of Clements was different from this case. In Clements, it was the plaintiff who wanted to explore the possibility that the expert witness's involvement in prior medical-malpractice actions had prejudiced the defendant's expert witness against plaintiffs. This case presents the reverse scenario, that is, the defendant doctor invokes Clements for the proposition that he has the right to explore whether prior medical-malpractice actions against the plaintiff's expert witness have biased that expert in favor of plaintiffs. Neither Clements nor logic will support this right.
"`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ala. R. Evid. 401. Under this rule, "[e]vidence is to be admitted if it possesses `any tendency,' in logic or experience, to lead to the fact or inference for which it is offered." Advisory Committee's Notes to Rule 401. The fact that Dr. *116 Gordon has himself been a medical-malpractice defendant has no tendency to prove bias in favor of plaintiffs.
Additionally, assuming  only for the sake of argument  that a malpractice defendant would, in some case, be entitled to impugn the credibility of the plaintiff's expert witness through reference to extraneous lawsuits, it could not be done in this case. This is so, because, contrary to Lightfoot's contention, Dr. Gordon's laparoscopic-cholecystectomy case is not remotely similar to the allegedly negligent conduct in this action. In Dr. Gordon's case, Dr. Gordon deliberately cut a bile duct, which he saw; here, he criticizes Dr. Lightfoot for failing to see an injury he allegedly inadvertently caused. Thus, the evidence has no tendency to show that Dr. Gordon was applying "two unique standards of care." In short, the evidence had no probative value for any issue material to this case. The trial court exceeded its discretion, therefore, in allowing Lightfoot to cross-examine Dr. Gordon regarding medical-malpractice actions in which Dr. Gordon was a defendant.
Finally, Middleton has demonstrated that the testimony "probably injuriously affected [his] substantial rights." Dr. Gordon was Middleton's only expert witness. Therefore, Dr. Gordon's testimony as to the breach of the standard of care was crucial to Middleton's case and was not cumulative. The inadmissible testimony elicited on cross-examination was detailed and copious, spanning 15 pages of trial transcript. Obviously, the evidence tended impermissibly to prejudice the jury against Dr. Gordon.[1]
For these reasons, the trial court erred in denying Middleton's motion for a new trial. The judgment is reversed, and the case is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
SEE, BROWN, JOHNSTONE, and HARWOOD, JJ., concur.
HOUSTON, J., concurs specially.
LYONS, J., concurs in the rationale in part and concurs in the result.
STUART, J., concurs in the result.
HOUSTON, Justice. (concurring specially).
I concur in the majority opinion. I write to note that I believe that the evidence of Dr. Gordon's past surgical mishaps, even if relevant, should have been excluded. Rule 402, Ala. R. Evid., states: "All relevant evidence is admissible, except as otherwise provided by ... statute.... Evidence which is not relevant is not admissible." Here, even if the evidence were relevant, the plain meaning of Ala.Code 1975, § 6-5-551, would operate to exclude it.
Section 6-5-551 states that in a medical-malpractice action, "[a]ny party shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission." We have repeatedly interpreted this provision according to the plain-meaning rule, ruling inadmissible all evidence of "other act[s] or omission[s]" outside those specifically pleaded. Ex parte Coosa Valley Health Care, Inc., 789 So.2d 208, 218 (Ala.2000); Ex parte Anderson, 789 So.2d 190, 195 (Ala.2000); Ex parte Ridgeview Health Care Ctr., Inc., *117 786 So.2d 1112, 1116-17 (Ala.2000). Dr. Gordon's surgical mishap indisputably occurred in a prior case, not the one before us, and is therefore outside the reach of discovery.
Lightfoot argues that § 6-5-551 applies only when a party seeks discovery about the acts or omissions of another party to the medical-malpractice action, and that the statute does not contemplate discovery concerning nonparties. Indeed, we stated in Ex parte Anderson that "[i]f all conditions of the statute are met, then any other acts or omissions of the defendant health-care provider are exempt from discovery." 789 So.2d at 195 (emphasis added). However, while this statement seems to cover only parties, such as a defendant, the question then before us was what acts or omissions were covered, not who was covered. Fairly read, our statement in Ex parte Anderson of who was governed by the statute was mere dicta. Thus we must now confront the identity question: Section 6-5-551 prohibits parties from discovering "other acts or omissions" of whom?
The Legislature may have intended to draft § 6-5-551 to concern only actual parties, but if it did, it did not properly express this intent. The language of § 6-5-551 is inclusive, prohibiting discovery "with regard to any other act or omission" (emphasis added). As a court, we must" `enforce the statute as written by giving the words of the statute their ordinary plain meaning.'" Ex parte Pfizer, Inc., 746 So.2d 960, 964 (Ala.1999)(quoting Ex parte T.B., 698 So.2d 127, 130 (Ala.1997)). In Ex parte Pfizer, decided before the Legislature amended the statute to prohibit a "party" from conducting discovery as to any other act or omission, we held that a similar prohibition on a "plaintiff" did not operate to prohibit a defendant from engaging in such discovery. 746 So.2d at 964-65. We stated that if the Legislature intended to mean a "party," "then the legislature should have used a broader term." Id. at 965. The Legislature subsequently amended the statute to say just that. Similarly here, if the Legislature intended to prohibit discovery of the acts or omissions of only a "party," it should have inserted that qualifier in the statute. And the Legislature is always free to insert such qualifying language into the statute. But that job is not for us; "it is our job to say what the law is, not to say what it should be." Ex parte Pfizer, 746 So.2d at 964. Accordingly, I conclude that the prohibition in § 6-5-551 is broad, denying a party the ability to discover "other acts or omissions" concerning any person, whether a party or not.
Because Ala.Code 1975, § 6-5-551, deems evidence concerning Dr. Gordon's acts or omissions inadmissible, all such evidence must be excluded under the command of Rule 402, Ala. R. Evid. Because the trial judge admitted this evidence, I believe he exceeded his discretion.
LYONS, Justice (concurring in the rationale in part and concurring in the result).
I concur with the majority's analysis of the absence of any basis for justifying the admissibility of Dr. Gordon's deposition testimony to show Dr. Gordon's bias. The majority opinion reverses the judgment of the trial court because it allowed evidence to be introduced with respect to Middleton's expert witness, Dr. Mark Gordon, a physician. I concur in the result as to that portion of the majority opinion.
Dr. Gordon testified that Dr. Lightfoot breached the standard of care in performing a laparoscopic cholecystectomy by failing to recognize that he had inadvertently punctured the bowel with a trocar (a surgical instrument) and then failing to discover and treat the injury before he closed the *118 incision. Lightfoot persuaded the trial court that evidence concerning Dr. Gordon's alleged deviation from the standard of care in an unrelated medical-malpractice action against Dr. Gordon involving a laparoscopic cholecystectomy was admissible in this action charging Dr. Lightfoot with deviating from the standard of care in a laparoscopic cholecystectomy. The evidence related to Dr. Gordon's deliberately clipping what he thought was in fact a vein, but which was in fact a small bile duct, and then failing to recognize his mistake before closing the incision.
The evidence surrounding Dr. Gordon's clipping of a bile duct he thought was a vein led to the filing of a medical-malpractice action against him in which he testified that he had not breached the standard of care. Lightfoot argued to the trial court that evidence of this incident is admissible to show a prior inconsistent statement on the part of Dr. Gordon. Lightfoot contends that this evidence shows that Dr. Gordon was applying "two unique standards of care."
The majority opinion concludes that the facts concerning Dr. Gordon's laparoscopic cholecystectomy are "not remotely similar to the negligent conduct in this action." 885 So.2d at 116. The majority opinion bases this conclusion on the following rationale:
"In Dr. Gordon's case, Dr. Gordon deliberately cut a bile duct, which he saw; here, he criticizes Dr. Lightfoot for failing to see an injury he allegedly inadvertently caused. Thus the evidence has no tendency to show that Dr. Gordon was applying `two unique standards of care.' In short, the evidence had no probative value for the issue material to this case."
885 So.2d at 116.
I do not consider the distinction between what Dr. Gordon saw and what Dr. Lightfoot failed to see at the time of the respective injuries to be determinative. While Dr. Gordon deliberately cut a bile duct, which he saw, the evidence showed that at the time he made the incision, he was under the erroneous impression that the bile duct was a vein, and that he continued to have this erroneous impression up to and past the time he closed the incision. Therefore, Dr. Gordon closed the incision and completed the procedure without realizing that he had cut a bile duct. According to Dr. Gordon, Dr. Lightfoot was guilty of a breach of the standard of care in failing to discover and treat a punctured bowel before closing the incision. Both physicians were thus susceptible to a charge that they had breached the standard of care in failing to discover and treat before closing the incision an injury inflicted during a laparoscopic cholecystectomy. However, the common fact that both physicians closed incisions in ignorance of the facts during the same kind of surgical procedure does not justify admission of the facts surrounding Dr. Gordon's procedure.
In the case before us, the injury that occurred during the surgery was a punctured bowel. In Dr. Gordon's case, the patient sustained a biliary injury because of what Dr. Gordon described as a "very rare anatomical anomaly." Dr. Gordon's patient, according to the undisputed evidence, was a thin young woman whose bile duct measured only a couple of millimeters and entered into the neck of her gallbladder. Dr. Gordon testified that it was such a tiny duct that he did not recognize it. Dr. Gordon's procedure took place in the region of the gallbladder, well away from the intestines. According to Dr. Gordon, "the bile duct was so tiny that I probably thought it was a vein because it was not going where it was supposed to be going." The failure to detect an injury to a tiny bile duct in a region away from the intestines *119 is not similar to a failure to detect a puncture wound to the bowel, a portion of the intestines. Absent similarity, the evidence loses materiality. It is impermissible to impeach a witness with evidence of self-contradiction on an immaterial matter. Charles W. Gamble, McElroy's Alabama Evidence § 156.01 (5th ed.1996).
The prejudicial effect of this evidence is exacerbated by the phonetic similarity between "bowel" and "bile." Indeed, the transcript reflects concerns over pronunciation of "bile" in a manner that could be understood as "bowel" during the reading to the jury of portions of Dr. Gordon's deposition by counsel for Lightfoot.
I therefore reach the same conclusion as the majority opinion as to the absence of similarity between the two incidents, but do so on different grounds. Therefore I must concur in the result as to this aspect of the opinion. It is not necessary to address other bases upon which Middleton relies in his effort to obtain a reversal of the judgment.
NOTES
[1] Indeed, we note that Lightfoot has presented arguments only in support of the admissibility of evidence of Dr. Gordon's laparoscopic-cholecystectomy case. In other words, Lightfoot ignores Middleton's contention that evidence of the other medical-malpractice actions was offered solely for the purpose of prejudicing the jury against Dr. Gordon.