BOLIN, Justice.
Jessica Eastman, as the dependent widow of David Bentley, deceased, and on behalf of Bentley’s three minor children (hereinafter “the plaintiff’), appeals the judgment entered on a jury verdict in favor of R. Warehousing and Port Services Inc. (hereinafter referred to as “R. Warehousing”). The plaintiff asserts (1) that she is entitled to a judgment as a matter of law (“JML”) on R. Warehousing’s affirmative defense based on the “loaned-servant” doctrine and (2) that she is entitled to a new trial because, she claims, counsel for R. Warehousing implied during opening statements, in violation of the collateral-source rule, that she had recovered workers’ compensation benefits from Richway Transportation Services, Inc (“Richway”). We affirm.

I. Facts and Procedural History

Richway is a trucking company that operates a facility in Mobile. Richway also has a facility in Georgiana and a facility in Greenville. On May 11, 2009, David Bentley, a truck driver employed with Richway, was scheduled to deliver a load of steel coils to Tennessee. Before leaving Rich-way’s Mobile facility, Bentley requested that Robbie Shaw, the operation and sales manager for Richway, examine the two front steering tires on the tractor-trailer truck he would be driving. The truck at issue was actually owned by Robin International Transport, Inc., and leased and/or loaned to Richway. According to Shaw, the left front driver’s side tire was worn, but the right passenger side tire appeared fine. Shaw nonetheless agreed that both tires should be replaced, and he provided Bentley with two new tires. As is customary, Shaw instructed Bentley to have the tires installed at Richway’s Georgiana facility, where Richway’s maintenance staff is located. On the day of the accident forming the basis of this action, Bentley had allegedly asked Shaw on three different occasions if he could have the tires installed at McGriff Tires in Mobile so that the tires could also be balanced. Shaw denied that Bentley requested to have the tires installed at McGriff Tires. While traveling on Interstate 65 from Mobile to the Georgiana facility, the right front steering tire of the truck blew out, causing Bentley to lose control of the truck. Bentley died as a result of the accident.
The plaintiff filed a •wrongful-death action, pursuant to § 6-5^410, Ala. Code 1975, against R. Warehousing.[1] R. *80 Warehousing is a brokerage company that hires outside trucking companies to pick up and deliver loads for its customers. R. Warehousing does not own trucks, nor does it employ any truck drivers. R. Warehousing and Richway are both family-owned businesses that share some of the same officers and shareholders. Nolan Richardson is the father of Chance Richardson and Michael Richardson. Nolan Richardson is employed by R. Warehousing; he also serves as vice president of Richway. Chance Richardson is the owner of R. Warehousing; he also serves as president of Richway. Michael Richardson is employed solely by R. Warehousing, and he receives his paychecks from R. Warehousing. Beginning in 2001, Nolan Richardson sent Michael to Richway to oversee and/or to manage the day-to-day operations at Richway.
At trial, the plaintiff alleged that R. Warehousing, through its employee, Michael Richardson, was in complete control of Richway’s day-to-day operations, including the maintenance of tires. More specifically, the plaintiff alleged that Michael Richardson was responsible for instituting the policy at Richway that led to Shaw’s ordering Bentley to drive from Mobile to Georgiana on worn front steering tires. In other words, the plaintiff sought to fasten liability for Bentley’s death on R. Warehousing on the theory that R. Warehousing reserved the right to control Rich-way’s operations and that R. Warehousing exercised that right through the conduct of R. Warehousing employee Michael Richardson. R. Warehousing, on the other hand, asserted that Michael Richardson, at all times relevant to the plaintiffs claim, was a “loaned servant” to Richway.
At trial, the evidence was undisputed that Michael Richardson was employed solely by R. Warehousing and that he answered to his father Nolan Richardson. The jury heard the video deposition of Nolan Richardson, who testified that Michael oversaw the day-to-day operations at Richway, that Michael ran the maintenance shop at Richway, and that Michael directed the repairs that were needed at Richway. Michael Richardson testified in his deposition that R. Warehousing “loans” him out at Richway to help supervise the operations and/or to manage the business. Chance Richardson testified as follows regarding R. Warehousing, Riehway, and Michael’s role at both companies:
“Q. Mr. Richardson, isn’t it true that back in 2009, May of 2009, that your brother, Mike Richardson, was the person most in charge of Richway Transportation in Alabama?
“A. Yes, he was the manager in Alabama, yes, sir.
[[Image here]]
“Q. Your dad sent Mike over to Alabama to manage Richway Transportation, correct?
“A. Yes, sir.
“Q. And would you agree then that Mike Richardson is [an] employee [of] R. Warehousing, isn’t he?
“A. Yes, sir; he is an employee of R. Warehousing.
“Q. So, you would agree then that R. Warehousing, through Mike Richardson, controlled Richway Transportation?
“A. I don’t agree with that.
[[Image here]]
“Q. You disagree that Mike’s responsibilities are to direct repairs that are needed on Richway trucks?
“A. He doesn’t direct repairs.
“Q. And you disagree that your dad sent him to oversee maintenance of Richway trucks?
“A. He sent him over [there] to manage, not oversee maintenance.
[[Image here]]
*81 “Q. [Chance], do Richway Transportation and R. Warehousing ... share the same officers and directors?
“A. Some, yes.
[[Image here]]
“Q. Chance, as I understand, you own a hundred percent of R. Warehousing; is that right?
“A. Yes, sir.
“Q. And you are president of Richway Transportation; is that right?
“A. That is correct.
“Q. To your knowledge, did Richway Transportation ever consent in any way to have R. Warehousing control its operations in Mobile, Alabama?
“A. No, sir.
[[Image here]]
“Q. Now, does R. Warehousing own any trucks?
“A. No, sir.
“Q. Does it employ any truck drivers?
“A. No, sir.
[[Image here]]
“Q. Are you familiar with DOT [Alabama Department of Transportation] regulations that relate to R. Warehousing?
“A. Yes sir.
[[Image here]]
“Q. Can R. Warehousing under DOT regulations run or control a truck company like Richway?
“A. No, sir.
[[Image here]]
“Q. Well, does R. Warehousing provide any benefits to any Richway employees in Mobile, Alabama?
“A. No, sir.
“Q. Do you know anything about any kind of work your brother might do for R. Warehousing in Mobile for its Houston operation?
“A. The only thing Michael would do would maybe broker loads....
[[Image here]]
“Q. Well, let me ask it this way, it is your understanding that your family sent Mike Richardson, your brother, over [to Richway] as a loaned servant to manage Richway’s operations in Mobile. “A. That’s correct.
[[Image here]]
“Q. What is a loaned servant?
“A. A loaned servant is somebody that works for one company that helps another company, you know, serve — what they need done.
[[Image here]]
“Q. ... Mike Richardson has been overseeing Richway Transportation since 2001 and he is still doing it today, correct?
“A. Well he was in college until 2004.
[[Image here]]
“A. My father sent him over [to Rich-way]. Michael came over here [in 2004], more often than he did in 2001.
“Q. And he has been here constantly from 2004 managing Richway Transportation?
“A. No, not constantly.
“Q. Well, it has not been a temporary assignment has it?
“A. It’s not constant, no.
[[Image here]]
“A. No, off and on, right.
“Q. I think you mentioned your father is the one that sent Mike over here?
“A. Yes, sir.
“Q. Is that who Mike reports to is your dad?
“A. Yes.”
There was also testimony introduced at trial demonstrating that Michael Richardson was the “head” person at Richway and *82 that he had instituted the policy at Rich-way regarding the inspection and installation of tires. Richway1 s operation and sales manager, Robbie Shaw, testified that Michael had hired him, that Michael was his supervisor, that Michael was the “head” person at Richway, and that Michael had the authority to hire and fire Richway employees. Shaw testified that, although he could make the decision regarding whether tires needed to be replaced, it was his practice to check with Michael to make sure it was okay. On the day of Bentley’s accident, Michael was not present at the Richway office. Shaw testified that he made the decision to provide Bentley with two new steering tires because the “tread depth was getting close.” Shaw also testified that Richway truck drivers normally had new tires installed at the Georgiana facility because that is where Richway’s maintenance staff is located. Shaw testified that, on the morning of Bentley’s accident, he could have sent Bentley to McGriff Tires to have his tires installed, but, he said, Bentley never asked for that. Richway truck driver Randy Matthews testified that Michael Richardson was his boss. Matthews also testified that, on the morning of Bentley’s accident, he overheard Bentley on three different occasions ask Shaw if he could have his tires installed at McGriff Tires in Mobile and that, each time, Shaw denied Bentley’s request. Richway safety administrator Keenan Bishop testified that Michael was his boss, that Michael was the head of Richway, that the Georgiana facility maintenance director, Randall Matthews, reported to Michael, and that Richway dispatchers reported to Michael. Patrick Freeman, terminal manager at the Rich-way facility in Greenville, testified that Michael was his boss, that Michael had instituted the policy requiring truck drivers to have their tires inspected by management in Mobile, and that Michael had told him to direct all truck drivers to the Georgiana facility to have tires installed because the cost of having tires installed at McGriff Tires in Mobile “was a little high.”
At the close of the evidence, the plaintiff moved for a JML on R. Warehousing’s defense based on the loaned-servant doctrine. The trial court denied the plaintiffs motion and submitted the case to the jury on the plaintiffs negligence claim and R. Warehousing’s defense that Michael Richardson was a loaned servant to Richway. The jury returned a verdict in favor of R. Warehousing, and the trial court entered a judgment based on the verdict. The plaintiff filed a motion to alter, amend, or vacate the judgment or, alternatively, for a new trial. The trial court denied that motion, and the plaintiff appealed.

II. Discussion

A. JML: The Loaned-Servant Doctrine

The plaintiff first contends that the trial court erred in denying her motion for a JML because, she claims, R. Warehousing failed to offer substantial evidence that would support a jury charge on the loaned-servant defense. This Court’s standard of review on a ruling on a motion for a JML is well settled.
“ ‘When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmov-ant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala. *83 Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).’
“Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).”
Ex parte Howell Eng’g & Surveying, Inc., 981 So.2d 413, 418 (Ala.2006).
In Alabama Power Co. v. Smith, 273 Ala. 509, 521-22,142 So.2d 228, 239 (1962), this Court elaborated as follows on the loaned-servant doctrine:
“An employee may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that the employee becomes the servant of such third person with all the legal consequences of the new relation. Whether one who is usually the servant of one master has become specially and temporarily the servant of another is ordinarily a question of fact. If, under the circumstances only one inference can be properly drawn, the court will determine the issue, but if reasonable men may fairly come to different conclusions respecting the inference to be drawn from the facts, the case will be one for the jury. United States Steel Corp. v. Mathews, 261 Ala. 120, 73 So.2d 239 [(1954)].
“... The result will be determined by answer to the questions: Whose work was the servant doing and under whose control was he doing it? It is the reserved right of control rather than its actual exercise that furnishes the true test of relationship. He is master who has the supreme choice, control, and direction of the servant and whose will the servant represents in the ultimate result and in all its details. There must be careful distinguishing between authoritative direction and control, and mere suggestion as to details or the necessary cooperation where the work furnished is part of a large undertaking. The fact that the borrower gives information and directions to the servant as to details of work or the manner of doing it does not make this general servant of the employer the servant of such other person. Where the evidence does not clearly establish who the employer is, consideration must be given to the character of the service to be rendered, the duration of employment, and the one who is paying the employee. United States Steel Corp. v. Mathews, supra.”
R. Warehousing in this case had the burden of producing substantial evidence that Michael Richardson was a loaned servant to Richway. See Hosea O. Weaver & Sons, Inc. v. Towner, 663 So.2d 892, 897 (Ala.1995) (“the loaned servant doctrine is an affirmative defense and ... the defendant has the burden of proof on such a defense”). The plaintiff argues that Chance Richardson’s conclusory statement that Michael Richardson was a loaned servant to Richway, without any evidence of which company controlled him, does not constitute substantial evidence. The plaintiff emphasizes that there was no evidence *84 of an oral or written contract between R. Warehousing and Richway regarding the services that Michael performed at Rich-way, that there was no evidence indicating that Michael’s service at Richway was temporary, that there was no evidence indicating that R. Warehousing was reimbursed by Richway for Michael’s services, and that there was no evidence that Michael was under the control and direction of Richway.
“The ultimate test in determining whether an employee has become a loaned servant is a determination of whose work the employee was doing and under whose control he was doing it.” United States Fid. & Guar. Co. v. Russo Corp., 628 So.2d 486, 489 (Ala.1993). The crucial question to be determined in this case is which employer had the right to control the particular act giving rise to Bentley’s death. In this respect, the Restatement (Second) of Agency § 227, Comment a (1958), states: “Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other.” (Emphasis added.) And, when the evidence does not clearly establish who the employer is, consideration can be given to the character of the service rendered. Alabama Power Co., supra.
It is undisputed that Michael Richardson was an employee of R. Warehousing and that Michael received his paychecks from R. Warehousing. As previously stated, Chance Richardson is the owner of R. Warehousing and serves as president of Richway. Chance testified that Michael was sent to Richway as a loaned servant to manage Richway and that Michael had been managing and/or overseeing the day-to-day operations at Richway on and off since 2001. Chance testified regarding the distinct differences between R. Warehousing and Richway. Chance testified that R. Warehousing was a brokerage company, that R. Warehousing arranged for cargo loads to be shipped from one location to another, that R. Warehousing did not own any trucks, that R. Warehousing did not employ any truck drivers, that R. Warehousing was not permitted under Alabama Department of Transportation (“DOT”) regulations to either run or control a trucking company like Richway, and that Richway never consented in any way to have R. Warehousing control its operations in Mobile. Chance also testified that the only job that Michael possibly performed for R. Warehousing was “maybe broker loads.”
As previously stated, the crucial question in this case is which employer had the right to control the particular act giving rise to Bentley’s death. The plaintiff alleged that the institution of the policy by Michael Richardson that led to Shaw’s ordering Bentley to drive from Mobile to Georgiana on worn tires is the act that gave rise to Bentley’s death. Suffice it to say, the jury could have inferred from Chance’s testimony that, although Michael Richardson was generally employed by R. Warehousing, Michael had become the special servant of Richway. Specifically, the jury could have inferred from the evidence that R. Warehousing had surrendered control and direction over Michael because Michael was sent to Richway to manage its day-to-day operations, which included instituting the policy relating to inspection and installation of tires. The jury could have further inferred from the evidence that the services Michael performed at Richway were totally outside the scope of the services conducted by R. Warehousing. This is especially true in *85 light of the testimony that Richway never consented in any way to have R. Warehousing control Richway’s operations and that R. Warehousing was not permitted under DOT regulations to control a trucking company like Richway. As previously noted, the plaintiff also emphasizes that there was no evidence indicating that Michael was under the control and direction of Richway. We note that the question of control in this case was apparently a close question in light of the testimony that R. Warehousing and Richway were separate and distinct companies yet shared some of the same officers and directors. The jury heard evidence indicating that Michael answered solely to Nolan Richardson, who was employed by R. Warehousing and who also served as vice president of Richway. However, there was no evidence indicating that Michael ever consulted with Nolan Richardson regarding the work he performed at Richway. The jury could have inferred from the testimony presented in this case that Michael, being in a managerial position, i.e., acting as “head” person at Richway, simply answered to no one while working at Richway but was performing the work of Richway at all times relevant to the plaintiffs claim. We conclude that, under the unique circumstances of this case, there was substantial evidence presented to create a jury question regarding whose work Michael was performing and under whose control he was performing it. Accordingly, the trial court’s instruction to the jury on the loaned-servant doctrine was not error. Moreover, the jury verdict in this case is strengthened by the trial court’s denial of the plaintiffs motion for a new trial. McKinney v. Alabama Power Co., 414 So.2d 938 (Ala.1982).

B. New Trial: The Collateral-Source Rule

The plaintiff also contends that she is entitled to a new trial because, she says, “the defendant violated Alabama’s long held rule that prohibits the introduction of workers’ compensation at trial.” Specifically, the plaintiff contends that, before trial, she had filed a motion in limine to exclude any evidence indicating that the plaintiff had received workers’ compensation benefits from Richway and that, during opening statements, counsel for R. Warehousing repeatedly implied that the plaintiff had sued for and recovered workers’ compensation benefits from Richway.
In Baldwin County Electric Membership Corp. v. City of Fairhope, 999 So.2d 448 (Ala.2008), this Court stated:
“Two fundamental principles govern the standard by which this Court reviews a trial court’s rulings on the admission of evidence. Middleton v. Lightfoot, 885 So.2d 111, 113 (Ala.2003). ‘ “ ‘The first grants trial judges wide discretion to exclude or admit evidence.’ ” ’ 885 So.2d at 113 (quoting Mock v. Allen, 783 So.2d 828, 835 (Ala.2000), quoting in turn Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala.1998)). However, ‘a trial court exceeds its discretion where it admits prejudicial evidence that has no probative value.’ 885 So.2d at 113 (citing Powell v. State, 796 So.2d 404, 419 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001)).
“ ‘ “ ‘The second principle “is that a judgment cannot be reversed on appeal for an error [in the improper admission of evidence] unless ... it should appear that the error complained of has probably injuriously affected substantial rights of the parties.” ’ ” ’ Middleton, 885 So.2d at 113 (quoting Mock, 783 So.2d at 835, quoting in turn Wal-Mart Stores, 726 So.2d at 655). See also Rule 45, Ala. R.App. P. ‘ “The burden of establishing that an erroneous ruling was prejudicial is on the appellant.” ’ Mid *86 dleton, 885 So.2d at 113-14 (quoting Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991)).”
Id. at 453.
In Illinois Central Gulf R.R. v. Haynes, 592 So.2d 536 (Ala.1991), this Court stated:
“[We have] strictly adhered to the collateral source rule and that under the rule any showing that the plaintiff received payments from a source wholly independent of the wrongdoer, such as workmen’s compensation or disability payments, constitutes reversible error.”
Id. at 541.
The complained-of statements by R. Warehousing’s counsel during opening statements were made without objection:
“This is Chance Richardson. He owns 100 percent of R. Warehousing. He is president of Richway Transportation Company. I can guarantee you Richway ... accepted full responsibility for Mr. Bentley’s death.
[[Image here]]
“But the plaintiffs in this case are unfortunately wanting, I guess, what you would call two bites at the apple.
“Mr. Bentley’s employer, Richway, took full responsibility and did what it was supposed to do.
[[Image here]]
“... You have got two separate companies and the plaintiffs want to make them one company so they get a second bite at the apple.
“They have already sued Richway Transportation before. You can look over here at every box they brought in this courtroom and every box they brought in here says, [the plaintiff] versus Richway Transportation Company.
[[Image here]]
“And not only has [the plaintiff] sued Richway before, she also sued Mr. Shaw, who made the decision to have him go to Georgiana. But he is not here either. The only company here today is R.
Warehousing.”
R. Warehousing asserts (1) that a fair reading of the above statements indicates that R. Warehousing did not inject the issue of the plaintiffs receipt of workers’ compensation benefits into the trial; (2) that the record contains no ruling by the trial court on the plaintiffs motion in li-mine; and (3) that, because the plaintiff failed to make any objection at the time the comments were made, she failed to preserve any error for appellate review. See Reusch v. Seaboard Sys. R.R., 566 So.2d 489, 491 (Ala.1990)(“Reusch argues that the trial court erred in admitting [the challenged] testimony. He never objected to the introduction of that testimony, however, and accordingly, because there had been no ruling on the motion in limine either, the record contains no ruling by the trial court concerning the admissibility of the testimony that Reusch now challenges. Reusch’s argument fails, because no adverse rulings are presented for review.”).
The plaintiff on the other hand contends in her reply brief that if a trial court’s order granting a motion in limine is absolute and unconditional, there is no need for a party to make any further objection to preserve error. See Perry v. Brakefield, 534 So.2d 602, 606 (Ala.1988) (“[U]nless the trial court’s ruling on [a] motion in limine is absolute or unconditional, the ruling does not preserve the issue for appeal.”). The record does not reflect the trial court’s ruling on the motion in limine. The plaintiff, however, contends that, based on the trial transcript and the history of the collateral-source rule, it can be inferred that there was a ruling on the motion in limine and that the ruling was absolute and unconditional. The plaintiff relies of the following portion of the trial transcript:
*87 “[Counsel for the plaintiff]: Judge, the court granted a motion in limine a while back, in fact [R. Warehousing] didn’t object to it, to exclude any evidence of worker’s compensation paid in. this case. In opening argument counsel [for R. Warehousing] said on two or three occasions that the plaintiffs were trying to get two bites at the apple and went on to say that Richway is taking responsibilities.
“So we think that that violates the motion in limine and at this point we would ask that the court would instruct [R. Warehousing’s] counsel not to get back in that in any way, not to mention it, not to infer to it.
“[The Court]: I think pushed in — I think it is okay. Don’t go a whole lot further.
“[Counsel for R. Warehousing]: No, sir; we are not going to mention [workers’ compensation] or anything.
[[Image here]]
“[The Court]: Okay. I was waiting for an objection, but there was none.
“[Counsel for the plaintiff]: I guess at this point we would ask the court to instruct them not to do it again, not to speak about other parties that were in the lawsuit.
“[The Court]: Unless it is otherwise material or relevant.”
We cannot conclude from the above colloquy that if there was a ruling on the motion in limine, the ruling was absolute and unconditional. If anything, the trial court’s comment — “I was waiting for an objection, but there was none” — suggests that, if there was a ruling, the ruling might have been only preliminary rather than absolute or unconditional. More importantly, it appears from the above colloquy that plaintiffs counsel seemed satisfied merely with asking the trial court to instruct defense counsel “not to get back in that in any way, not to mention it, not to infer it,” rather than obtaining a ruling on an objection to preserve error. See Harley-Davidson, Inc. v. Toomey, 521 So.2d 971, 972 (Ala.1988)(“ ‘A party who invokes no further action by the court, thereby indicating his satisfaction, cannot complain of the court’s failure to do what [it] was not asked to do.’” (quoting C.C. Hooper Cafe Co. v. Henderson, 223 Ala. 579, 582, 137 So. 419, 422 (1931))).
The Court of Civil Appeals, in Johnson v. L.O., 42 So.3d 759 (Ala.Civ.App.2010), addressed a similar factual situation:
“Roy next claims that the trial court erroneously allowed L.O.’s attorney to reveal to the jury during his opening statement that Steven had been indicted for rape, sexual abuse, or domestic violence arising out of the Baldwin County incident. Before trial, Steven filed a motion in limine to prevent L.O. from presenting evidence of the specific allegations underlying Steven’s arrest and indictment. After L.O.’s attorney stated that he would indicate merely that Steven had been indicted, which led to the August 13, 2006, negotiations between Roy and L.O., the trial court granted the motion and instructed the attorneys to approach the bench if ‘somebody wants to get into that.’ During his opening statement, L.O.’s attorney nevertheless stated:
“ ‘[T]he evidence will be when she moved down here, things began to escalate, and in July of ’06, there was an incident at a condo in Gulf Shores, Alabama, which Steve was ultimately indicted by the grand jury of Baldwin County for rape and sexual abuse — I am sorry — domestic violence, of this young lady, his wife, and they had been talking divorce, the evidence is going to be, but it was just kind of lagging along.’
“Neither Roy nor Steven objected to the statement, moved for a mistrial at that *88 time, asked for any limiting instruction to the jury, or took any other action to cure the alleged violation of the order granting the motion in limine. Roy now asserts on appeal that he was ‘severely prejudiced’ by that statement.
“By ordering the parties to first approach the bench before ‘getting into’ the details of the indictment, the trial court did not absolutely prevent the parties from bringing to the jury’s attention the details of the indictment; it merely entered a prohibitive preliminary order. See Charles Gamble, The Motion in Limine [:] A Pretrial Procedure That Has Come of Age, 33 Ala. L.Rev. 1, 12 (1981). Therefore, when L.O.’s counsel referred to the underlying offenses of which Steven had been indicted, the burden rested on Roy to object to that statement at that time to the extent he deemed it prejudicial to his case in order to preserve that issue for appellate review. See Cromie Investments, Inc. v. Reid, 740 So.2d 400 (Ala.1999) (holding that grant of a motion in limine does not relieve a moving party of the burden of making a timely and specific objection at the moment evidence made the subject of the motion is introduced at trial); Bowens v. Southern Ry., 599 So.2d 588 (Ala.1992) (failure of moving party to object during trial to evidence made the subject of a motion in limine preliminarily granted before trial waived appellate review of that evidentiary issue). Because Roy did not object during the opening statement, he cannot now claim that the trial court erred in allowing L.O.’s attorney to refer to the underlying offenses in the indictment.”
Id. at 765-66.
Accordingly, because there is no indication in the record that the trial court’s ruling on the motion in limine was absolute and unconditional, see Perry, supra, and because there is no adverse ruling presented for our review, the plaintiffs argument fails and, thus, cannot serve as the basis for a new trial. Reusch, supra.
Based on the foregoing, the judgment of the trial court is due to be affirmed.
AFFIRMED.
MOORE, C.J., and MAIN and BRYAN, JJ., concur.
MURDOCK, J., concurs specially.

. The plaintiff filed for, and received, workers’ compensation benefits from Richway; however, Richway is not a party to this appeal. The plaintiff also sued Robin International Transport, Inc. The trial court entered a summary judgment in favor of Robin International. The notice of appeal to this Court indicates that the plaintiff also appealed the summary judgment entered in favor of Robin International. However, the plaintiff fails to address the summary judgment entered in favor of Robin International in her briefs to this Court. "Issues not argued in a party’s brief are waived.” Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1167 (Ala.2003). We therefore do not address the summary judgment in favor of Robin International; we address only those issues raised by the plaintiff as they pertain to R. Warehousing.